BOARD OF EDUCATION, BOROUGH OF UNION BEACH, A BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF, v. NEW JERSEY EDUCATION ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, UNION BEACH TEACHERS ASSOCIATION, NATIONAL EDUCATION ASSOCIATION, FREDERICK L. HIPP, HAYDEN L. MESSNER, JR., JOHN MOLLOY AND HARRY A. HALLER, DEFENDANTS.

Superior Court of New Jersey
Chancery Division

Decided August 4, 1967.

*Mr. Theodore W. Geiser* for plaintiff (*Messrs. Pindar, McElroy, Connell & Foley,* attorneys).

*Mr. Joseph N. Dempsey* and *Mr. Cassel R. Ruhlman, Jr.* for defendants.

*Mr. Thomas P. Cook* for State Federation of District Boards of Education, *amicus curiae.*

LANE, J. S. C. Plaintiff seeks a declaratory judgment that certain actions of defendants are illegal and in violation of the New Jersey Constitution, and a mandatory injunction requiring them to take immediate steps to withdraw certain actions taken by them threatening the imposition of charges of breach of professional ethics or other action against persons who may seek employment with plaintiff.

Plaintiff is a municipal corporation whose members are properly holding office under *R. S.* 18:1–1 *et seq.*, as amended. Defendant New Jersey Education Association (NJEA) is an association which represents teachers and administrators in public school systems in New Jersey. Its membership totals approximately 57,000. Its purpose is to improve education in the public school systems in New Jersey and to work for the benefit of the teaching profession. Defendant Union Beach Teachers Association (UBTA) is a voluntary organization representing 46 of the 47 full-time teachers in plaintiff's system. Defendant Frederick L. Hipp is the executive secretary of the NJEA and has been so since 1946; to all intents and purposes, he is the chief executive officer of that association. Defendants Hayden L. Messner, Jr. and John Molloy are field representatives of NJEA who actively worked with the UBTA during the time the events that precipitated this action occurred. Defendant Harry A. Haller, a former teacher in the Union Beach school system, was president of the UBTA. He had not acquired tenure but would have, had a contract been offered to him for the school year 1967-68. Defendant National Education Association (NEA) is a national association with which NJEA is affiliated.

The relationship between the Union Beach Board of Education (board) and the teachers in the school system had been generally good prior to February 1967. During that month a dispute arose between Donald Ostrander, secretary of the board, and Haller concerning the mailing of certain information to voters in Union Beach immediately prior to the resubmission of the budget to the voters. On March 14, 1967 the board met to consider teachers' contracts for the following school year. Contracts were not offered to Haller, president of the UBTA; Mrs. Petrasek, a member of the UBTA's executive committee, or John Gall, an active member of the UBTA. Notice of such action by the board was given Haller on March 29, 1967.

On March 30, 1967 a special meeting of the UBTA was called for March 31, 1967. In attendance at that meeting were Molloy and Messner. The topic discussed was the failure of the board to offer a contract to Haller. The following resolution, which had been prepared before the meeting, was adopted:

"BE IT HEREBY RESOLVED that WE THE TEACHERS OF UNION BEACH do once again reaffirm our confidence in and support of our duly elected representatives and spokesmen Harry Haller, President; Frederick Cook, Vice President; and John Pikula, Welfare Committee Chairman.

LET IT FURTHER BE KNOWN that WE view the following situations intolerable and will continue to make every effort to see that such unethical, undemocratic and/or educationally unsound practices once and forever cease to exist in the District of Union Beach:

1. The failure to provide a program to develop a meaningful and effective curriculum;

2. The failure to provide adequate and constructive supervision of classroom teachers;

3. The failure to provide for the co-ordination of methods and subject matter as it is being taught in these schools;

4. The failure to provide teachers with necessary and adequate textbooks and supplies;

5. The failure to provide adequate classroom space;

6. The failure to provide necessary police protection at after school affairs;

7. The failure to provide teachers with recourse in the cases of habitual offenders and problem children;

8. The failure to support teachers in the area of discipline to the point that students have become aware of this lack of support;

9. The failure of the Board to consult teachers concerning the school calendar;

10. The failure of the Board to provide adequate administrative leadership free from internal conflict;

11. The repeated attempts to stifle and intimidate teachers' views and opinions;

12. The refusal to look into the causes of the high teacher turnover in Union Beach;

13. The failure of the Board to live up to agreements to:

    a. Invite teachers to budget meetings;

    b. Conduct 'prior discussion with representatives of the teaching staff' concerning personnel changes as outlined in the *Union Beach Public Schools Proposals for Adopting Personnel Policies, Individual Procedures, and Group Negotiations* released in a directive to the teaching staff in the spring of 1966;

c. Continue planned projects and discussions with the teachers 'after the budget was passed.'

14. The failure to advertise extra teaching jobs among all members of the teaching staff;

15. The refusal to recognize or reply to recent repeated appeals concerning declining teacher morale and conditions with the school;

16. The repeated failure to accept duly elected spokesmen of the Union Beach Teachers Association as being representative of the membership and conditions existing within the schools;

17. The direct and deplorable action taken in dismissing qualified and competent leaders (and nontenure teachers) of the Union Beach Teachers Association.

LET IT HEREBY BE KNOWN that having prior to the election actively and enthusiastically supported the budget and incumbent Board members, WE do hereby withdraw this support until such time as immediate and irrevocable steps are taken to substantially provide for the correction of the aforementioned practices and conditions."

The members present at the meeting were advised by the representatives of the NJEA that there was a new era for teachers' rights; that a board of education could no longer fail to reemploy a nontenure teacher without giving a reason, and that the solution was for the teachers to resign *en masse*. The teachers were requested to submit written resignations. Such resignations could only be made upon 60 days' notice. Before March 31, 1967 none of the 17 items referred to in the resolution had ever been presented to the board as a grievance or as a failure in the system.

As the result of a telegram sent by one of the representatives of the NJEA to the members of the board, a meeting of the board and representatives of the UBTA, together with Molloy and Mesaner, was held April 3, 1967. At that meeting no grievance or proposal was presented by or on behalf of the teachers. The only request, which was made by defendant Molloy, was to have the board explain why a contract had not been offered to Haller. Molloy desired to have the members of the board polled as to the offering of the contract to Haller. This request was refused. The resolution adopted by the UBTA on March 31, 1967 was not presented to the board at this meeting.

On April 4, 1967 the board held its regular monthly meeting. After the business meeting Haller for the first time presented a copy of the March 31, 1967 resolution and also presented envelopes containing resignations from 36 of the 47 teachers. These resignations were effective June 3, 1967, which was some two to three weeks before the end of the school year. Many of those resigning were tenure teachers.

The board had in effect a procedure for individual grievances and for group negotiations. Although not the most carefully drawn procedure, it does provide in paragraph 3 for bringing before the board matters of policy affecting the school system as a whole.

The discord between the teachers and the board arose from one fact and one fact alone, namely, the failure of the board to offer contracts to Haller, Mrs. Petrasek and Gall. The so-called 17 points contained in the resolution were merely feigned and had never been the subject of any grievances by the UBTA.

On April 11, 1967 the UBTA invoked "sanctions" against the board, allegedly because of its refusal to enter into negotiation or discussion of their mutual problems. A copy of the resolution invoking "sanctions" by the UBTA was sent to the NJEA so that with NJEA help the UBTA "could focus public and professional attention on the unsatisfactory conditions in the schools of Union Beach."

At a meeting of the executive committee of the NJEA held April 21, 1967, a resolution was adopted supporting the sanctions resolution adopted by the UBTA, invoking statewide sanctions against the Union Beach school system and requesting help from the NEA in supporting the sanctions.

Under date of May 3, 1967, "Notice of Professional Sanctions" in Union Beach, New Jersey, was distributed by the NJEA to the state preparation colleges in Pennsylvania, New York, West Virginia, Connecticut, Delaware and Maryland; to all presidents, placement directors, stu-

dent magazines and student education association presidents in the preparation colleges in Pennsylvania, New York, West Virginia, Connecticut, Delaware and Maryland; to all state association executive secretaries; to all presidents and placement directors in all teachers' colleges in New Jersey, and to the chairmen of the education department and the faculty association presidents of the six New Jersey state colleges. In addition, several thousand notices were sent to NJEA representatives assigned to various buildings in selected school districts surrounding Union Beach. The letter accompanying the sanctions provided as follows:

"This is to advise that on April 21, 1967, sanctions were imposed on the Union Beach Public Schools by the New Jersey Education Association. This action has been taken at the request of the Union Beach Teachers Association.

This action is the result of declining educational conditions in Union Beach and the school board's arrogance, ineptitude, neglect and arbitrary reprisals against teachers.

So long as pending issues remain unresolved and current attitudes remain unchanged, New Jersey Education Association sanctions will remain in effect.

The New Jersey Education Association calls upon all sectors of the teaching profession—teachers, administrators, retired teachers, educational organizations, prospective teachers, and institutions of higher education which prepare teachers—to bring the moral weight of our profession to bear on behalf of the fine, professional teachers of Union Beach by fully observing the state and local sanctions hereby proclaimed.

Further, the New Jersey Education Association calls upon the Union Beach community, through its board of education, to seek equitable resolution of the teacher-school board conflict before further damage is done to educational opportunities for the children of Union Beach and to the cultural and economic life of the city itself."

The sanctions notice read as follows:

"NOTICE OF
PROFESSIONAL SANCTIONS
IN UNION BEACH, N. J.
BY ORDER OF THE NEW JERSEY EDUCATION
ASSOCIATION

1. No action has been taken by the board of education on any of 17 grievances submitted to the board of education by the Union Beach Teachers Association.
2. Among these grievances are 'failure to provide: necessary and adequate textbooks and supplies, adequate classroom space,

necessary police protection at after-school affairs, adequate and constructive supervision of classroom teachers, and a program to develop a meaningful and effective curriculum.'

3. The board has not 'supported teachers in the area of discipline' and has not provided 'adequate administrative leadership free from internal conflict.'

4. The board has consistently refused to accept the duly elected leaders of the UBTA as representatives of the association membership.

5. The school board has made repeated attempts to stifle and intimidate teachers who express their views and opinions.

6. In March, the school board announced that it had summarily decided not to renew the contracts of four officials of the UBTA, including the association's president. (In protest, some 33 of the school district's 43 classroom teachers have given 60 days required notice that their services will terminate on June 3.)

All educators are advised of:

Principle IV, Section 3, of the Code of Ethics of the Education Profession:

'Fill no vacancy except where * * * a climate conducive to professional service exists.'

NEA Resolution 66–16:

'A violation of sanctions by a member of the profession is a violation of the "Code of Ethics of the Education Profession." Therefore, the offering or accepting of employment in areas where sanctions are in effect should be evaluated in terms of the Code, and local, state, and national associations should continue to develop procedures for disciplining members who violate sanctions.'

EFFECTIVE APRIL 21, 1967"

In the foregoing notice the first four lines were in large, bold type, with the words "Professional Sanctions" in letters twice as high as the line preceding and the line following those words. In front of the lines beginning "Principle IV" and beginning "NEA" were black squares. The lines themselves were in bold type. The bottom line of the notice was also in large, bold type.

The action taken by NJEA was taken without any independent investigation on behalf of its executive committee, but based merely upon a report made by Messner, who had been instrumental in bringing about the confrontation of the board by the UBTA. There was no testimony given by Messner as to what he had told the executive committee.

There was no testimony that the executive committee had been told that there was a grievance procedure in effect in the district. There was no testimony that Messner had advised the executive committee that the so-called grievances had been presented for the first time to the board on April 4 with the resignations.

The adoption of "sanctions" was specifically intended to discourage teachers from applying for jobs in the Union Beach school system. It was testified that NJEA would apply "sanctions" until the conditions about which it complained were corrected to its satisfaction, which usually was determined by the local association. It was admitted that "sanctions" are adopted to "encourage" a board of education to do acts that NJEA and the local teachers association wanted done. The manner in which such "encouragement" would be effective was that by the adoption of "sanctions" it would be difficult for the board of education to employ teachers.

In addition to the distribution of the notice of sanctions, the application of "sanctions" to the Union Beach school system was reported in a publication of NJEA that is sent to all its 57,000 members. It was assumed by the executive director of NJEA that notice of the "sanctions" appeared in the NEA publication.

Under date of May 5, 1967 Messner wrote to four teachers to whom contracts had been offered by plaintiff for the school year 1967–68, stating that the district was under "local, county, state and national sanctions." He called attention to the reference in the notice of sanctions to NEA resolution 66–16. He then continued:

"If a contract is signed by you while professional sanctions are in effect in Union Beach, you will be in violation of the professional code of ethics. I am sure you will act accordingly with the highest interests of the profession foremost in mind."

What was done here was the extreme sanction of resignation of teachers and the blackballing of the district. The

effect of such action was described by Dr. Hipp on an earlier occasion as follows:

"Legality may not be the crucial issue. The argument that extreme sanction is legal while a strike is not is not impressive. Both involve withdrawal of service and in both children miss certain expected schooling. The extreme sanction of resignation of teachers and black-balling of the district, even though it may be legal, can have a far more devastating effect upon children than the typical brief teachers' strike. In my book any work stoppage, legal or illegal, is a strike. A strike is a sanction and extreme sanction is a strike."

The ultimate sanction that can be applied by NJEA is to pressure teachers of the school district to leave and to pressure other teachers not to accept positions. For a violation of "sanctions" the NJEA can censure or expel a member or can refuse membership to teachers not already members.

Upon application of plaintiff an interlocutory injunction was granted, subsequently modified so that defendants and all persons acting in consort with them were restrained from any further dissemination of the "Notice of Professional Sanctions" in Union Beach, from the publication of any similar statements referring to "sanctions" in connection with plaintiff, from threatening applicants to plaintiff for employment, and from threatening plaintiff's personnel engaged in processing applications for employment.

At the trial no testimony was offered by defendants. They rested at the conclusion of plaintiff's case, except to introduce an amended section of the NEA'S resolution 67–16. Neither Haller, Messner nor Molloy chose to testify.

The board is a public agency and therefore its employees do not have collective bargaining rights. In *Delaware River and Bay Authority v. International Organization, etc.*, 45 *N. J.* 138 (1965), the Supreme Court stated:

"The delegates to the 1947 Constitutional Convention included many who were thoroughly familiar with the differentiation in the field of labor relations, between governmental or public employees on the one hand, and nongovernmental or private employees on the

other hand. They included members of the Governor's Committee on State-Employee Relations which, in 1942, had submitted a report recognizing the right of public employees to organize and be heard through representatives of their own choosing on questions of wages, hours, and working conditions generally, but pointing out that public employees do not have, in any full sense, the collective bargaining rights available to private employees and *may not engage in the coercive activities available to the latter.* The Committee expressed its complete agreement with President Franklin D. Roosevelt's well known comment that 'a strike of public employees manifests nothing less than an intent on their part to prevent or obstruct the operations of government until their demands are satisfied' and that 'such action, looking toward the paralysis of government by those who have sworn to support it, is unthinkable and intolerable.' See also *Donevero v. Jersey City Incinerator Auth'y, supra,* 75 *N. J. Super.,* at *p.* 223.

*Article* 1, *par.* 19 of the Constitution clearly recognizes the distinction between public and private employees. Thus it provides broadly that '[p]ersons in private employment shall have the right to organize and bargain collectively,' and more narrowly, that '[p]ersons in public employment shall have the right to organize, present to and make known to the state, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.' " (at *pp.* 144–145; emphasis supplied)

▉ The actions taken by all of the defendants constituted a coercive activity designed for the sole purpose of compelling the board to act in accordance with their desires. As such it was in violation of *Art. I, par.* 19 of the 1947 *New Jersey Constitution* as interpreted by our Supreme Court.

In enjoining a strike of employees of the New Jersey Turnpike Authority, the court stated in *N. J. Turnpike Authority v. American, etc., Employees,* 83 *N. J. Super.* 389 (*Ch. Div.* 1964):

"Although the ruling of the Law Division that by striking the employees had lost their employment notwithstanding the Veterans' Tenure Act, *N. J. S. A.* 38:16–1, which provides that veterans employed by government may not be removed except for good cause shown, was reversed by the Appellate Division, the lower court's finding that as a matter of law public employees do not have a right to strike was specifically affirmed. This court heartily endorses and agrees in principle and application with this thesis.

This prohibition is not without good reason, for the public health and safety must be safeguarded.

'Under our system, the government is established by and run for all of the people, not for the benefit of any person or group. The profit motive, inherent in the principle of free enterprise, is absent. It should be the aim of every employee of the government to do his or her part to make it function as efficiently and economically as possible. The drastic remedy of the organized strike to enforce the demands of unions of government employees is in direct contravention of this principle.' *Norwalk Teachers' Association v. Board of Education*, 138 *Conn.* 269, 83 *A.* 2d 482, 484, 31 *A. L. R.* 2d 1133, (*Sup. Ct. Err.* 1951).

It would be a derogation of the authority of this State's legally constituted public officials to permit public employees to strike, for the right to determine conditions of employment and rates of compensation rests exclusively with the Turnpike. For this reason, a strike would be unable to accomplish the relief sought. Not only would a strike be ineffectual, *but any such action, the intended result of which is the disabling of government, is inimical to the public interest and will not be tolerated.*" (at p. 396; emphasis supplied)

Defendants contend that their actions are protected by the First Amendment to the Federal Constitution, relying primarily upon *Garrison v. State of Louisiana*, 379 *U. S.* 64, 85 *S. Ct.* 209, 13 *L. Ed.* 2d 125 (1964); *Brotherhood of R. Trainmen v. State of Virginia*, 377 *U. S.* 1, 84 *S. Ct.* 1113, 12 *L. Ed.* 2d 89, 11 *A. L. R.* 3d 1196 (1964), and *New York Times Co. v. Sullivan*, 376 *U. S.* 254, 84 *S. Ct.* 710, 11 *L. Ed.* 2d 686 (1964).

Here, however, we are not dealing with freedom of speech but rather with expression and threatening action to accomplish a purpose prescribed by the public policy of the State of New Jersey.

In *Brotherhood of R. Trainmen v. State of Virginia*, *supra*, the court stated:

"It cannot be seriously doubted that the First Amendment's guarantees of free speech, petition and assembly give railroad workers the right to gather together *for the lawful purpose* of helping and advising one another in asserting the rights Congress gave them in the Safety Appliance Act and the Federal Employers' Liability Act, statutory rights which would be vain and futile if the workers could not talk together freely as to the best course to follow." (377 *U. S.*, at pp. 5-6, 84 *S. Ct.*, at p. 1116; emphasis supplied)

In *Garrison v. State of Louisiana, supra,* the court explained the *New York Times* decision (*New York Times Co. v. Sullivan, supra*) stating:

"We held in New York Times that a public official might be allowed the civil remedy only if he establishes that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. The reasons which led us so to hold in *New York Times,* 376 *U. S.,* at 279–280, 84 *S. Ct.,* at 724–726 [11 *L. Ed. 2d* at 706, 95 *A. L. R. 2d* 1412] apply with no less force merely because the remedy is criminal. The constitutional guarantees of freedom of expression compel application of the same standard to the criminal remedy. Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned. And since ' * * * erroneous statement is inevitable in free debate, and * * * it must be protected if the freedoms of expression are to have the "breathing space" that they "need * * * to survive" * * *,' 376 *U. S.,* at 271–272, 84 *S. Ct., at* 721, 11 *L. Ed. 2d* at 701, 95 *A. L. R. 2d* 1412, only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government. The First and Fourteenth Amendments embody our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.' New York Times Co. v. Sullivan, 376 *U. S.,* at 270, 84 *S. Ct.,* at 721, 11 *L. Ed. 2d* at 701, 95 *A. L. R. 2d* 1412." (85 *S. Ct.,* at *p.* 215, 13 *L. Ed. 2d,* at *pp.* 132–137)

Plaintiff does not seek to enjoin debate but seeks to enjoin unlawful activities.

■ By reason of the fact that defendants were not acting lawfully but were in fact acting in violation of the New Jersey Constitution, the First Amendment affords no protection.

That defendants' activities are not protected by the First and Fourteenth Amendments is clearly shown by *Cox v. State of Louisiana,* 379 *U. S.* 536, 85 *S. Ct.* 453, 13 *L. Ed. 2d* 471 (1965). Mr. Justice Goldberg speaking for the court stated:

"We emphatically reject the notion urged by appellant that the First and Fourteenth Amendments afford the same kind of freedom

to those who would communicate ideas by conduct such as patrolling, marching, and picketing on streets and highways, as these amendments afford to those who communicate ideas by pure speech. See the discussion and cases cited in No. 49, post, at *p.* 480. We reaffirm the statement of the Court in *Giboney v. Empire Storage & Ice Co., supra,* 336 *U. S.,* at 502, 69 *S. Ct.,* at 691 [93 *L. Ed.,* at 834, 843] that 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" (85 *S. Ct.,* at *p.* 464, 13 *L. Ed. 2d,* at *p.* 484)

In *International Brotherhood v. Vogt,* 354 *U. S.* 284, 77 *S. Ct.* 1166, 1 *L. Ed. 2d* 1347 (1957), the court affirmed an order restraining picketing which was carried on for an unlawful purpose. Mr. Justice Frankfurter stated:

"The implied reassessments of the broad language of the Thornhill case were finally generalized in a series of cases sustaining injunctions against peaceful picketing, even when arising in the course of a labor controversy, when such picketing was counter to valid state policy in a domain open to state regulation. The decisive reconsideration came in *Giboney v. Empire Storage & Ice Co.,* 336 *U. S.* 490, 69 *S. Ct.* 684, 93 *L. Ed.* 834. A union, seeking to organize peddlers, picketed a wholesale dealer to induce it to refrain from selling to nonunion peddlers. The state courts, finding that such an agreement would constitute a conspiracy in restraint of trade in violation of the state anti-trust laws, enjoined the picketing. This Court affirmed unanimously.

'It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgment of free speech because the picketers were attempting peacefully to publicize truthful facts about a labor dispute. * * * But the record here does not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings, and the argument of the appellants, the sole immediate object of the publicizing adjacent to the premises of Empire, as well as the other activities of the appellants and their allies, was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities * * * constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. In this situation, the injunction did no more than enjoin an offense against Missouri law, a felony.' *Id.* 336 *U. S.* at 497–498, 69 *S. Ct.,* at *page* 688.

The Court therefore concluded that it was 'clear that appellants were doing more than exercising a right of free speech or press. * * * They were exercising their economic power together with that of their allies to compel Empire to abide by union rather than

by state regulation of trade.' *Id.* 336 *U. S.* at 503, 69 *S. Ct.*, at *page* 691." (77 *S. Ct.*, at 1170, 1 *L. Ed. 2d*, at *p.* 1352)

See also *Delaware River and Bay Authority v. International Organization, etc.*, 45 *N. J.* 138, 211 *A. 2d* 789 (1965), where the court said:

"The Union contends that to the extent the August 28th order precluded peaceful picketing it amounted to an unconstitutional deprivation of free speech within *Thornhill v. State of Alabama*, 310 *U. S.* 88, 60 *S. Ct.* 736, 84 *L. Ed.* 1093 (1940), and *American Federation of Labor v. Swing*, 312 *U. S.* 321, 61 *S. Ct.* 568, 85 *L. Ed.* 855 (1941). But these have been limited by later opinions of the Supreme Court and it is now clear that peaceful picketing for an unlawful purpose may be enjoined without running counter to any constitutional guarantees. See *International Brotherhood, etc. v. Vogt, Inc.*, 354 *U. S.* 284, 77 *S. Ct.* 1166, 1 *L. Ed. 2d* 1347 (1957) ; *Ind. Dairy Workers, etc. v. Milk Drivers, etc. Local No.* 680, *supra*. In the latter case, this court flatly rejected a contention that the picketing there engaged in was protected by the due process clause, noting that 'peaceful picketing may be enjoined if its purpose is to violate a significant and reasonable state policy established either by legislative or judicial decision.' 30 *N. J.*, at *p.* 184. Since a strike by the employees of the Authority would be illegal, picketing in furtherance thereof would not be constitutionally protected and could properly be enjoined; in the context here we find no merit in the Union's contention that the August 28th order violated its constitutional rights." (at *pp.* 149–150)

█ If this court were to accept defendants' explanation as to the cause of the resignations and the imposition of "sanctions," still the actions taken would be illegal. The employees of the board do not have the right to engage in collective bargaining. If they have a grievance arising under the school laws, they should have proceeded in accordance with the grievance procedure that was in effect within the school system. If that procedure was not effective, they then could have applied to the Commissioner of Education for appropriate relief.

█ Defendants contend that no relief should be granted to plaintiff under the doctrine of clean hands. This, of course, assumes that there was misconduct on the part of plaintiff, which finding this court cannot make upon the

evidence. In any event, the doctrine of clean hands is not available to defendants. Plaintiff is seeking to restrain conduct by them which was in violation of the Constitution of New Jersey. It is, in effect, seeking to enforce the rights of the public in Union Beach. Defendants appear to argue that their conduct was justified because of plaintiff's actions. However, this court does not believe that unconstitutional conduct is justifiable.

In *Miller's Inc. v. Journeyman Tailors, &c.*, 128 N. J. *Eq.* 162 (*E. & A.* 1940), the court in a *per curiam* decision commented on an evidence question as follows:

"We find no merit in the arguments advanced by appellants as grounds for reversal. One of the grounds urged is that the court below erred in its rulings on the admissibility of evidence. The evidence offered by the appellant and excluded was for the purpose of showing the circumstances of the negotiations for the renewal of the appellant's contract; the motives which actuated the picketing and the absence of malice; and that the respondent was in court with unclean hands. Suffice it to say that we find that the rulings did not prejudice the rights of appellant and did not constitute reversible error." (at *p.* 163)

The case was subsequently reversed by the United States Supreme Court, 312 *U. S.* 658, 61 *S. Ct.* 732, 85 *L. Ed.* 1106.

In *Hansen v. Local No.* 373, 140 N. J. *Eq.* 586 (*Ch.* 1947), the court restrained picketing and refused to apply the clean hands doctrine, stating:

"Here the unlawful character of the picketing practiced by the defendants is acknowledged, but the insistence of counsel for the defendants is that the complainants originated and intensified the basic jurisdictional dispute and by their own course of conduct superinduced the retaliatory action of which they now complain. The defendants invoke the equitable principle exemplified by the familiar maxim: 'He that hath committed iniquity shall not have equity.'

The maxim in its application has its limitations. It has its logical justification only in considerations of good conscience and natural justice. The inequity which deprives a suitor of a right to justice in a court of equity must be evil practice or wrong conduct in the particular matter of transaction in respect to which judicial protection or redress is sought. *Neubeck v. Neubeck*, 94 N. J. *Eq.* 167; 119 *A.* 26, 27 *A. L. R.* 172.

It must be realized that the principle is not employed out of regard for the defendant, but because of the unwillingness of the court to grant its aid in the particular circumstances of the given case. Good conscience and natural justice are the decisive factors. *Prindiville v. Johnson & Higgins*, 93 *N. J. Eq.* 425; 116 *A.* 785.

And so there are cases in which a court of equity in fulfillment of the reasons and objects of its creation and existence may in furtherance of natural justice protect the lawful rights of the one who comparatively is the more innocent. 3 *Pom. Eq. Jur. 5th Ed.*, § 942.

And, moreover, even when the parties have been found to be *in pari delicto*, equitable relief has at times been awarded on the ground that in the particular case public policy has been found to be best conserved by that course. *Pendleton v. Gondolf*, 85 *N. J. Eq.* 308, 314; 96 *A.* 47. Would it be in the public interest even impliedly or inferentially to intimate to the complainants that their remedy is physically to overpower the resistence of the defendants by the enlistment of a regiment of superior force?" (at *pp.* 589–590, 55 *A.* 2d, at *p.* 300)

In *Medical Fabrics Co. v. D. C. McLintock Co.*, 12 *N. J. Super.* 177 (*App. Div.* 1951), the court discussed the doctrine, stating:

"The clean hands doctrine is an ethical concept long applied in courts of equity although not peculiar thereto. *Chafee, Some Problems of Equity* (1950), *pp.* 1, 94. In general, its requirement is not that suitors seeking relief in equity 'shall have led blameless lives' (*Loughran v. Loughran*, 292 *U. S.* 216, 229, 54 *S. Ct.* 684, 689, 78 *L. Ed.* 1219, 1227 (1934)), but rather that they shall not have acted fraudulently or unconscionably with respect to the particular controversy in issue. *Precision Instr. Mfg. Co. v. Automotive M. Mach. Co.*, 324 *U. S.* 806, 815, 65 *S. Ct.* 993, 89 *L. Ed.* 1381, 1386 (1945); *Neubeck v. Neubeck*, 94 *N. J. Eq.* 167, 170 (*E. & A.* 1922). When applicable it is invoked not out of regard for the defendant or to punish the plaintiff but upon larger considerations 'that make for the advancement of right and justice.' *Johnson v. Yellow Cab Transit Co.*, 321 *U. S.* 383, 387, 64 *S. Ct.* 622, 88 *L. Ed.* 814, 819 (1944). *Cf. Casini v. Lupone*, 8 *N. J. Super.* 362, 365 (*Ch. Div.* 1950); *Hansen v. Local No.* 373, 140 *N. J. Eq.* 586, 589 (*Ch.* 1947).

While the doctrine is firmly rooted and naturally appeals to persons of good conscience, it may well disserve the interests of justice if applied over-sensitively or as a rigid formula restraining the court's just exercise of discretion. *Precision Instr. Mfg. Co. v. Automotive M. Mach. Co.*, *supra; Chafee, supra, p.* 99. Accordingly, there has been a recent wholesome tendency amongst courts to apply the doctrine flexibly in the light of the particular circumstances presented." (at *pp.* 179–180)

Finally, in *Staedler v. Staedler*, 6 *N. J.* 380 (1951), the court refused to apply the doctrine, stating:

"The argument made by the appellant in support of the estoppel is really an argument for the application of the doctrine of clean hands to the particular facts of this case. But the application of the doctrine of clean hands is purely discretionary and should not be applied where it will produce a result *contra* to the firm public policy of this State in a matter of such fundamental importance as the preservation of the dignity of the marital relationship. 3 *Pomeroy's Equity Jurisprudence, section* 941, *page* 736." (at *p.* 394, 78 *A. 2d*, at *p.* 903)

Here the application of the doctrine, even if it be proven, would certainly be contrary to the public policy of the State.

Defendants further contend that plaintiff is not entitled to an injunction because no irreparable injury has been shown.

In *Eleuteri v. Richman*, 43 *N. J. Super.* 303 (*Ch. Div.* 1956), affirmed 47 *N. J. Super.* 1 (*App. Div.* 1957), affirmed 26 *N. J.* 506 (1958), *certiorari* denied 358 *U. S.* 843, 79 *S. Ct.* 52, 3 *L. Ed. 2d* 77, plaintiff sought to restrain the Attorney General and county prosecutor from using, in a criminal trial against the plaintiff, evidence collected as a result of an illegal search and seizure. Justice (then Judge) Haneman stated:

"Ordinarily and normally an injunction does not lie against a threatened act merely because it is illegal or transcends the constitutional power if it does not inflict irreparable injury upon the plaintiff. (Citations omitted.)

The plaintiffs must show not only that the act complained of is unconstitutional but that it will inflict an irreparable or irremediable injury." (43 *N. J. Super.*, at *p.* 312)

In *Hodge v. Giese*, 43 *N. J. Eq.* 342 (*Ch.* 1887), the court defined irreparable injury as follows:

"The complainant's case presents a strong instance of irreparable injury. All that is meant by that phrase is that the injury shall be a material one, and of such a nature as cannot be adequately redressed by pecuniary damages. Mere inconvenience, resulting in but

slight damage, may, in consequence of its peculiar character, constitute an injury so irreparable in its nature as to be the proper subject of redress by injunction." (at *p.* 350)

The Court of Errors and Appeals in *Scherman v. Stern,* 93 *N. J. Eq.* 626 (*E. & A.* 1922), said:

"An injury is irreparable when it cannot be adequately compensated in damages or when there exists no certain pecuniary standard for the measurement of the damage. Inadequacy of damages as a compensation may be due to the nature of the injury itself or the nature of the right or property injured. Acts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issue of a preliminary injunction." (at *p.* 631)

See also *Phelps Dodge, &c., Corp. v. United, &c., of America,* 138 *N. J. Eq.* 3 (*Ch.* 1946), affirmed *sub nom. Westinghouse Electric Corp. v. United Electrical, &c.,* 139 *N. J. Eq.* 97 (*E. & A.* 1946); *Ferraiuolo v. Manno,* 1 *N. J.* 105, 108 (1948).

The law as to the granting of injunctions, as set forth in 4 *Pomeroy's Equity Jurisprudence,* § 1338, *pp.* 935–936 is:

"In determining whether an injunction will be issued to protect any right of property, to enforce any obligation, or to prevent any wrong, there is one fundamental principle of the utmost importance, which furnishes the answer to any questions, the solution to any difficulties which may arise. This principle is both affirmative and negative, and the affirmative aspect of it should never be lost sight of, any more than the negative side. The general principle may be stated as follows: Wherever a right exists or is created, by contract, by the ownership of property or otherwise, cognizable by law, *a violation of that right will be prohibited,* unless there are other considerations of policy or expediency which forbid a resort to this prohibitive remedy. *The restraining power of equity extends, therefore, through the whole range of rights and duties which are recognized by the law, and would be applied to every case of intended violation, were it not for certain reasons of expediency and policy which control and limit its exercise.* This jurisdiction of equity to prevent the commission of wrong is, however, modified and restricted by considerations of expediency and of convenience which confine its application to those cases in which the legal remedy is not full and adequate. Equity will not interfere to restrain the breach of a contract, or the commission of a tort, or the violation of any right, when the legal remedy of compensatory damages would be complete

and adequate. The incompleteness and inadequacy of the legal remedy is the criterion which, under the settled doctrine, determines the right to the equitable remedy of injunction."

█ It can, therefore, be said that the irreparable injury that must be shown means no more than an injury that is material for which pecuniary damages would not afford adequate compensation.

█ The stated purpose of the action taken by defendants was to make it impossible for the board to employ teachers in the school system. The fact that pressure was applied to persons in the teaching profession would of necessity cut down on the selection available to plaintiff. The board has, in fact, staffed its school for the 1967–68 year; however, it must be remembered that defendants were restrained by a preliminary injunction. Pecuniary damages could not afford adequate compensation to plaintiff. Irreparable injury would be suffered by it if relief were not granted by this court.

█ Defendants NJEA and NEA allege that they as associations have the right to discipline their members and that this is all they would be doing if they censure or expel members who accepted employment in the board's system. Reliance is placed upon *Bayer v. Brotherhood of Painters, &c.*, 301, 108 *N. J. Eq.* 257 (*E. & A.* 1930), and *Dragwa v. Federal Labor Union No.* 23070, 136 *N. J. Eq.* 172 (*Ch.* 1945).

In *Bayer*, the court stated the issue to be:

"The question to be decided, then, is as to the right of employes to combine, and, by peaceable means, to refuse to work for an employer who does not conform to the rules of the union, and to persuade others to leave such employment or to refuse to enter such employment." (at *p.* 259)

In reversing a decree granting an injunction restraining defendants from placing complainant on an unfair list maintained by defendant union, the court said:

> "Nothing has been proved in this case to warrant a finding that the defendants have done or threatened anything *that is not legalized by the acts of the Legislature.*
>
> It seems clear from the statutes and the decisions of the courts of our own state, as well as of other jurisdictions, that employes may combine for their mutual protection; that they may for themselves conclude what acts and things are for their economic welfare; that they may enforce their demands by strikes, if they thereby violate no contracts of employment; that they may peaceably, and without threats or ,intimidation, induce others to do so, if no contractual rights are violated thereby. None of these acts is unlawful, and the fact that complainant may be affected unfavorably by the regulations of the union established to further their own interests does not render them unlawful." (at *p.* 261; emphasis supplied)

The actions of defendants here have been found to be illegal, and therefore neither *Bayer* nor *Dragwa supra,* is applicable.

In Dragwa the court, in refusing to intervene in an internal controversy of defendant union as a result of which the complainant was expelled from the union, stated:

> "Let me digress from this commentary at this point to state that if a voluntary trade organization should ordain that a member who in the pursuit of his occupation exceeds the average level of industry and production of his fellow workers, shall be expelled for conduct unbecoming a member, I would experience no hesitancy in invalidating such a regulation as positively repugnant and inimical to our traditional public policy. The freedom of an individual to excel in any field of lawful activity is one of our national ideals and a substantial right which the individual may not himself barter away." (at *p.* 176)

By analogy, a threatened action of defendant associations against members violating the "sanctions" is repugnant to our public policy.

Defendants will be restrained and enjoined from making any press releases, notices or statements that "sanctions" have been or are being applied to plaintiff. UBTA, NJEA and NEA will be restrained and enjoined from in any way threatening censure, expulsion or any other action against any member of the teaching profession who accepts a position with plaintiff. Defendants NJEA and NEA

will be required to give as wide distribution to the restraint as they gave to the "Notice of Professional Sanctions." The use of the word "sanctions" itself, applied for coercive purposes to plaintiff, a public agency, by UBTA, NJEA and NEA, private associations, will be enjoined. There is no intention, however, of restraining defendants from exercising the right of free speech concerning what they think the conditions are in the Union Beach school system.

If the parties cannot agree on the form of a notice to be distributed and published, they may be heard at a mutually convenient time within the next two weeks.

Judgment consented to as to form will be presented within 10 days, in accordance with *R. R.* 4:55–1, embodying the views set forth herein.