75 N.J. Super. 217 (1962)
182 A.2d 596
JOHN DONEVERO, HANK WILKINSON, JOHN J. CASSERLY, WILLIAM PASIK, HARRY MORSE, EARNEST SORIERO, CARMINE SORIERO, HENRY E. PRINCE, AND ANDREW J. McALEER, PLAINTIFFS,
v.
JERSEY CITY INCINERATOR AUTHORITY, A BODY CORPORATE AND POLITIC, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided June 20, 1962.
*219 Mr. Norman N. Schiff, attorney for plaintiffs Harry Morse and John J. Casserly.
Mr. William M. Feinberg appeared for plaintiff Andrew J. McAleer (Messrs. Feinberg, Dee & Feinberg, attorneys).
Mr. Robert H. Wall, attorney for defendant.
ROSEN, J.C.C. (temporarily assigned).
This action was commenced by complaint in lieu of prerogative writs. Since the institution of this suit, six of the nine plaintiffs have discontinued their actions. Two of the remaining plaintiffs, Harry Morse and Andrew J. McAleer, seek reinstatement of their employment with the defendant and back pay. Plaintiff John J. Casserly died July 14, 1961, and his wife seeks back pay from October 8, 1960 to said date.
Based upon a written stipulation and oral testimony, the court finds the following facts. Plaintiffs were honorably discharged veterans having served with the armed forces of the United States. In 1957 plaintiff Morse was employed by the defendant, Jersey City Incinerator Authority (hereinafter referred to as Authority) as a truck driver, and later promoted to a foreman. In June 1961 he returned to work for the Authority "without prejudice to this case." Plaintiff McAleer was employed as a crane operator and plaintiff Casserly as personnel manager. The employment in each instance was for a term not fixed by law. Plaintiffs were members of Local 825, International *220 Union of Operating Engineers (hereinafter referred to as Local 825).
On February 6, 1960 the majority of "inside" employees of the Authority designated Local 825 as their representative for the purpose of presenting grievances and proposals, pursuant to the provisions of N.J. Const., Art. I, par. 19.
On February 19, 1960 ten employees of the Authority were dismissed for economy. On February 22, 1960 a walkout of all "inside" employees occurred and a picket line was formed. A suit was instituted by the Authority in the Superior Court, Chancery Division, to enjoin the strike. Subsequently, and after a hearing, an injunction was granted, but the ten employees were ordered restored to their employment. During the period from February 11, 1960 through September 1960 the union repeatedly requested an oral hearing with the Authority for the purpose of making known certain grievances and proposals, but the request was denied. Local 825 instituted an action in the Superior Court, Law Division, to compel the Authority to grant an oral hearing for the presentation of the employee's grievances and proposals. On September 30, 1960 the court dismissed the action and an appeal was taken. At the oral argument in the Supreme Court, the Authority agreed to grant an oral hearing as requested by Local 825. On March 16, 1961 the hearing was held.
The "inside" employees of the Authority, including plaintiffs, ceased working on October 8, 1960. The Authority, through proper representatives of the employees, requested that the men return to work on said date, but they failed to respond. The employees formed a picket line outside the plant. There were no threats or intimidation to prevent any employee from returning to work. The picketing was described as a peaceful, uneventful gathering. The reason given for the walkout of the "inside" employees was that they had "information" that an individual who was not a member of the union was to be granted an increase over and above that received by employees performing the *221 same work who were represented by Local 825. No testimony was presented as to the reliability or truthfulness of the "information" which caused the walkout. Subsequent to October 8, 1960 the court enjoined the strike and directed the striking employees to return to work. The employees who had "walked off the job" on October 8, 1960 stayed out until October 17, 1960. For a period commencing October 8, 1960 and ending three or four weeks later, the Authority was unable to fully and properly perform its functions, which consisted of the collection and disposal of garbage in Jersey City.
The City of Jersey City created the Authority under the Incinerator Authorities Law. Although a municipal agency, the Authority was clothed by the Legislature with the status of "a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions." In section 2 of the Incinerator Authorities Law, supra, the Legislature declared it to be
"* * * in the public interest and to be the policy of the State to foster and promote by all reasonable means the health and welfare of the citizens thereof by the proper collection and disposal of garbage and other refuse matter."
The defendant is obviously a public body having corporate form and attributes. The Authority was created to perform a public duty, namely, to provide for collection and disposal of garbage in the City of Jersey City. Under the unequivocal terms of the Incinerator Authorities Law, the Authority is "an agency and instrumentality" of the city. Its work is admittedly public in nature and in furtherance of the municipal welfare. It is a separate entity with statutory power independent of the municipality, but nonetheless engaged in a municipal function. DeVita v. Housing Authority of City of Paterson, 17 N.J. 350, 359, 360 (1955).
Although discussing the Sewerage Authorities Law, N.J.S.A. 40:14A-2 et seq., the language used by Justice Heher *222 in Camden County v. Pennsauken Sewerage Auth., 15 N.J. 456, 468 (1954), is apropos.
"* * * The authority is a politico-economic unit, largely self-contained and self-sufficient, for greater economic and administrative efficiency in a sensitive and critical area rendered more complex by industrial expansion and rapid population growth, autonomous for quasi-legislative and administrative purposes, but an agency of the municipality nevertheless for a governmental service that under the legislative scheme is one of the local government's primary concerns. * * *"
The first question to be decided is whether the plaintiffs had a right to strike and picket against the Authority. Mr. Justice Brandeis, in Dorchy v. Kansas, 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248 (1926), stated that "Neither the common law, nor the Fourteenth Amendment confers the absolute right to strike." The right of employees in private industry to organize and to assert their rights by collective action has been recognized in this country. National Labor Relations Act, c. 7, 29 U.S.C.A. § 157. These rights include the right to peacefully picket. In Thornhill v. Alabama, 310 U.S. 88, 106, 60 S.Ct. 736, 746, 84 L.Ed. 1093 (1940), the principle was laid down that peaceful picketing for the purpose of publicizing truthful facts of an industrial labor dispute was an exercise of freedom of discussion which under the Fourteenth Amendment to the United States Constitution could not be generally prohibited by state action. However, there is no right in employees to strike or picket against the government, whether federal, state or a political subdivision of a state. Annotation, "Union Organization and Activities of Public Employees," 31 A.L.R.2d 1142 (1953); Rhyne, Municipal Law (1957), secs. 8-30, pp. 162 et seq. 1 Teller, Labor Disputes and Collective Bargaining, Cum. Sup. (1947). The primary reason for the vitality of the view that the government is immune to strikes is to safeguard and protect public health and safety. This basic concept is emphasized in Norwalk Teacher's Association *223 v. Board of Education, 138 Conn. 269, 83 A.2d 482, 31 A.L.R.2d 1133 (Sup. Ct. Err. 1951).
"Under our system, the government is established by and run for all of the people, not for the benefit of any person or group. The profit motive, inherent in the principle of free enterprise, is absent. It should be the aim of every employee of the government to do his or her part to make it function as efficiently and economically as possible. The drastic remedy of the organized strike to enforce the demands of unions of government employees is in direct contravention of this principle. (at p. 484 of 83 A.2d)
* * * In the American system, sovereignty is inherent in the people. They can delegate it to a government which they create and operate by law. They can give to that government the power and authority to perform certain duties and furnish certain services. The government so created and empowered must employ people to carry on its task. Those people are agents of the government. They exercise some part of the sovereignty entrusted to it. They occupy a status entirely different from those who carry on a private enterprise. They serve the public welfare and not a private purpose. To say that they can strike is the equivalent of saying that they can deny the authority of government and contravene the public welfare." (at p. 485 of 83 A.2d)
From the point of view of the social necessity, the municipal immunity from a strike is understandable when we realize that uninterrupted public service is in the public interest and welfare. In 1942 the Governor's Committee made a valuable report of the status of unions in public employment. In underscoring the statement that "the public interest is paramount" the committee said:
"Those entrusted with the administration of the powers of government, whether acting collectively or singly, of necessity must conform their conduct to that principle. The right of association for the common good is subject to well-defined limitations inherent in the relationship existing between the State and its employees. The State is a union or society of its people for the promotion of their mutual safety and advantage by their joint efforts. Public employment imposes a special trust or duty for the maintenance of governmental functions to this end. Continuity of government and its essential services is vital to our society; and this is the measure of the solemn obligation undertaken by those who enter the public service. The practice of the contrary view would inevitably lead *224 to disorder and chaos in government. Government exists for the benefit of all the people. Any action by public employees in violation of this principle would constitute a perversion of the power reposed in them."
See Note: 75 Harv. L. Rev. 391 (1961), Kaplan, "Have Public Employees the Right to Strike?" 30 Nat. Mun. Rev., 518 (1941); Cornell, "Collective Bargaining by Public Employee Groups," 107 U. Pa. L. Rev. 43 (1958).
The N.J. Const., Art. I, par. 19, provides that:
"Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing."
The application of the law according to the spirit of the legislative body remains the principal objective of judicial interpretation. 2 Sutherland, Statutory Construction (3d ed.), sec. 4501, p. 315. Under Art. I, par. 19, of the State Constitution of 1947, persons in public employment are given the right to organize, present and make known their grievances and proposals through representatives of their own choosing. This provision does not, in terms, confer any right on the part of public employees to strike. It was clearly the understanding and intention of the Constitutional Convention, which drafted the basic State Charter, that no such right to strike on the part of public employees was to be implied from the language used. In this respect, the then existing state of the law, was not to be altered. See: 1 Proceedings of the N.J. Constitutional Convention of 1947, p. 661. The strike is not a permissible method of enforcing plaintiffs' demands.
The plaintiffs contend that if they did participate in an illegal strike, yet they could not be removed from their employment except for good cause shown after a hearing. In support of their thesis they cite the Veteran's Tenure Act, R.S. 38:16-1, as amended by L. 1942, c. 83, which provides that:
*225 "No person now holding any employment, position or office under the government of this State, or the government of any county or municipality, including any person employed by a school board or board of education, or who may hereafter be appointed to any such employment, office or position, whose term of employment, office or position is not now fixed by law, and receiving a salary from such State, county or municipality, including any person employed by a school board or board of education, who has served as a soldier, sailor, marine or nurse, in any war of the United States, or in the New Jersey State militia during the period of the World War, and has been honorably discharged from the service of the United States or from such militia, prior to or during such employment in or occupancy of such position or office, shall be removed from such employment, position or office, except for good cause shown after a fair and impartial hearing, but such person shall hold his employment, position or office during good behavior, and shall not be removed for political reasons." (Emphasis supplied)
This statute affords tenure protection to veterans who are state, county or municipal employees, whose terms of office are not "fixed by law." Such employees may not be removed "except for good cause shown after a fair and impartial hearing." The Legislature enacted L. 1945, c. 175 (N.J.S.A. 38:23A-3), and included within the protection of R.S. 38:16-1 employees of governmental agencies within the State, whether they be employed strictly by the State or a county or municipality, or broadly by a State, county or municipal instrumentality or agency engaged in the discharge of a public function. DeVita v. Housing Authority, above, at p. 359.
Our courts have long recognized the importance of the Veteran's Tenure Act and have accorded to veterans within its purview the full measure of protection which the Legislature intended to give to them. DeVita v. Housing Authority of City of Paterson, 17 N.J. 350, 354-356 (1955); Connelly v. Housing Authority of Jersey City, 63 N.J. Super. 424 (App. Div. 1960); Miele v. McGuire, 53 N.J. Super. 506 (Law Div. 1959), modified 31 N.J. 339 (1960); Gill v. Board of Education of Hamilton Township, 44 N.J. Super. 79 (App. Div. 1957). A veteran covered by this act is protected against the arbitrary or capricious governmental *226 employer who may be more concerned with political expediency than the merits of employment. Stewart v. Board of Chosen Freeholders of Hudson County, 61 N.J.L. 117, 119 (Sup. Ct. 1897). The protection afforded in this legislation is not "lightly to be whittled away." Gill v. Board of Education of Hamilton Township, supra, at p. 83 of 44 N.J. Super. But these valuable and preferential individual rights cannot be accorded recognition when the veteran's conduct is contrary to public policy.
It is apparent that the employees were aggrieved because of their inability to obtain an oral hearing from the Authority to discuss their grievances and proposals. On September 30, 1960 the court dismissed the employees' action to force the Authority to grant them an oral hearing. On October 8, 1960 the employees dissatisfaction culminated in the strike. The strike was planned by plaintiffs representative, Local 825. It was called without notice to the Authority. The reason given for the strike was that the employees had "information" that a nonunion employee was going to receive higher wages than a union man doing the same work. As earlier noted, there is not a scintilla of evidence to support this position. Plaintiffs were requested and given the opportunity to return to work by the Authority. They continued their unlawful acts until enjoined by the court. It was the obligation of these employees to return to work on October 8, 1960. The plaintiffs were not discharged or removed by the Authority. It was plaintiffs' voluntary act which terminated their employment. They were never lulled into a false belief that their positions would be available regardless of when they decided to return to work. It is axiomatic that a person cannot benefit from his own wrongful conduct. The Authority's function is admittedly public in nature and in furtherance of the municipal welfare. To justify plaintiffs' conduct in engaging in an unlawful strike because of their disappointment or disallusionment in not obtaining an oral hearing with the Authority would be to put a premium on *227 resort to illegal practices instead of legal remedies and would subvert the principle of law and order.
In private employment strikers do not lose their standing as employees during the continuance of a strike, and at the conclusion of the strike ordinarily have the right of reinstatement to their former duties. But regardless of the nature of the strike, the right of reinstatement is lost if the striker engages in unlawful conduct or if the strike itself is unlawful. Public Utility Construction, etc., Local 274 v. Public Serv. Elec., etc., Co., 26 N.J. 145, 153, 154 (1958).
When the facts and circumstances are assayed in light of the principle that public employment is a public trust which imposes upon the employee the performance of certain duties for the common good, plaintiffs' failure to return to work on October 8, 1960 was tantamount to abandonment of their employment. Cf. State Highway Dept. v. Civil Service Comm., 35 N.J. 320 (1961); Vanderbach v. Hudson County Board of Taxation, 133 N.J.L. 126, 128 (E. & A. 1945). By their conduct, plaintiffs removed themselves from the protective limits of the Veteran's Tenure Act.
An appropriate judgment may be submitted in accordance with these conclusions.