696 A.2d 585

IN THE MATTER OF NEW JERSEY TURNPIKE AUTHORITY, APPELLANT–RESPONDENT, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 73, RESPONDENT–APPELLANT.

NEW JERSEY TURNPIKE AUTHORITY, APPELLANT–RESPONDENT, v. AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, COUNCIL 73, LOCALS 3912, 3913 AND 3914, RESPONDENTS–APPELLANTS.

Argued March 18, 1997—Decided July 14, 1997.

*Robert E. Anderson*, General Counsel, argued the cause for appellant Public Employment Relations Commission.

*Steven P. Weissman* argued the cause for appellants American Federation of State, County and Municipal Employees, Council 73 and American Federation of State, County and Municipal Employees, Council 73, Locals 3912, 3913 and 3914 (*Weissman & Mintz*, attorneys).

*Michael K. Furey* argued the cause for respondent (*Riker, Danzig, Scherer, Hyland & Perretti*, attorneys; *Mr. Furey* and *James P. Anelli*, on the brief).

*Michael L. Diller*, Senior Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey (*Peter G. Verniero*, Attorney General, attorney; *Mary C. Jacobson*, Assistant Attorney General, of counsel).

*Gerald L. Dorf* argued the cause for *amicus curiae* New Jersey State League of Municipalities (*Dorf & Dorf*, attorneys; *Mr. Dorf* and *Mitchell L. Dorf*, on the brief).

*Joseph Licata* submitted a brief on behalf of *amicus curiae* New Jersey State AFL–CIO (*Loccke & Correia*, attorneys; *Richard D. Loccke*, of counsel; *Mr. Licata* and *Leon B. Savetsky*, on the brief).

*Sanford Oxfeld* submitted a brief on behalf of *amicus curiae* New Jersey Deputy Fire Chiefs (*Balk, Oxfeld, Mandell & Cohen*, attorneys; *Randi Doner April*, on the brief).

*Paul L. Kleinbaum* submitted a brief on behalf of *amicus curiae* International Association of Fire Fighters, AFL–CIO (*Zazzali, Zazzali, Fagella & Nowak*, attorneys).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns whether certain New Jersey Turnpike Authority (Authority) employees can join collective negotiating units. The New Jersey Employer–Employee Relations Act (Act), *N.J.S.A.* 34:13A–1 to –29, provides public employees with broad

powers to "form, join and assist" employee organizations. *N.J.S.A.* 34:13A–5.3. Two important exceptions to that right involve "managerial executives" and "confidential employees." *See ibid.* Managerial executives are those who "formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices...." *N.J.S.A.* 34:13A–3(f). Confidential employees possess "functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process [that] would make their membership in any appropriate negotiating unit incompatible with their official duties." *N.J.S.A.* 34:13A–3(g).

Those statutory definitions have been interpreted by the Public Employment Relations Commission (PERC), the body charged with enforcing and implementing the Act. *See N.J.S.A.* 34:13A–5.2. Relying in part on its own interpretations of the managerial executive and confidential employee exceptions, PERC certified Authority employees for membership in three separate negotiating units. The Authority appealed all three certifications, claiming that the certified employees should have been excluded because they were either managerial executives or confidential employees or because public policy required their exclusion. The Appellate Division reversed and remanded, construing both the managerial executive and confidential employee exceptions more broadly than did PERC, and noting that "[t]he practical effect of PERC's decision is to leave the Authority with only twenty members of its management team from whom it can expect full loyalty uncompromised by union membership." 289 *N.J.Super.* 23, 26, 672 *A.2d* 1244 (1996). PERC and the American Federation of State, County and Municipal Employees, Council 73 (AFSCME) petitioned for certification. We granted both petitions. 147 *N.J.* 261, 686 *A.2d* 763 (1996).

I

The New Jersey Turnpike Authority was created by the Legislature in 1948 to design, construct, operate and maintain a high

speed, limited access roadway. *See L.* 1948, *c.* 454, § 1 (codified as amended at *N.J.S.A.* 27:23–1). The Turnpike is now 148 miles long; an average of approximately 550,000 vehicles per day traveled the Turnpike in 1995. *Manual of the Legislature of New Jersey* 168 (1997). Approximately 2365 employees work for the Authority. *Ibid.*

Testimony before PERC's hearing officer revealed that the Authority's Commissioners ultimately are responsible for all policies, budget approval, personnel actions, negotiations, and contract administration approval, subject to the Governor's veto power. Below the Commissioners in the Authority's management structure is an Executive Director, who is responsible for the day-to-day management of the Authority. *See N.J.A.C.* 19:9–7.2. At the time of the PERC decisions, the Authority was divided into nine departments, each run by a department director: engineering; maintenance; tolls; operations; finance and budget; law; public affairs; human resources; and administrative services and technology.

In June 1991, AFSCME petitioned PERC to represent eighty-eight Authority employees in a supervisory unit. The petitioned-for employees occupied positions subordinate to that of department director. The Authority opposed the petition, claiming that all of the petitioned-for titles were inappropriate for inclusion in a collective negotiating unit because they were managerial executives or confidential employees, because supervisory conflicts existed between the titles, and also because the titles subject to the petition included nonsupervisory personnel who should not be represented in a supervisory unit. PERC referred the contested matter to a hearing officer for factfinding and recommendation. The hearing officer heard fourteen days of testimony, after which she produced a 163–page report recommending that all but fourteen of the petitioned-for titles be certified. H.O. No. 93–2, 19 *N.J.P.E.R.* ¶ 24154 (1993).

The Authority filed exceptions to the hearing officer's report. PERC transferred the case to itself pursuant to *N.J.A.C.* 19:11–8.8

(subsequently recodified at *N.J.A.C.* 19:11–9.1) and issued a decision that modified the hearing officer's recommendations slightly. P.E.R.C. No. 94–24, 19 *N.J.P.E.R.* ¶ 24218 (1993). PERC accepted the hearing officer's recommendation to exclude fourteen employees from the negotiating unit. Additionally, PERC, in order to prevent intra-unit conflicts, excluded five nonsupervisors from the unit, as well as twenty employees who supervised lower-level supervisors in the unit. Although PERC's decision excluded more employees from unit membership than the hearing officer's report, PERC generally rejected the Authority's claim that many of the affected employees were either managerial executives or confidential employees. *Ibid.* When considering the Authority's claims concerning managerial executive status, PERC relied largely on its decision in *Borough of Montvale,* P.E.R.C. No. 81–52, 6 *N.J.P.E.R.* ¶ 11259 (1980). That opinion reads in pertinent part:

A person formulates policies when he develops a particular set of objectives designed to further the mission of the governmental unit and when he selects a course of action from among available alternatives. A person directs the effectuation of policy when he is charged with developing the methods, means, and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors. Simply put, a managerial executive must possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes. Whether or not an employee possesses this level of authority may generally be determined by focusing on the interplay of three factors: (1) the relative position of that employee in his employer's hierarchy; (2) his functions and responsibilities; and (3) the extent of discretion he exercises.

PERC determined that "[n]one of [the petitioned-for employees] exercises a level of authority and independent judgment sufficient to broadly affect the Authority's purposes or means of effecting these purposes." 19 *N.J.P.E.R.* ¶ 24218. After considering, among other things, "the Act's policy favoring organization of all employees desiring it," PERC determined that, with the exception of one employee, "the petitioned-for employees do not meet the narrow definition of managerial executive." *Ibid.*

Concerning confidential employees, PERC reiterated its holding in *State of New Jersey,* P.E.R.C. No. 86–18, 11 *N.J.P.E.R.* ¶ 16179 (1985):

> The Commission's approach to confidential employee disputes has thus been consistent since 1970. We scrutinize the facts of each case to find for whom each employee works, what he does, and what he knows about collective negotiations issues. Finally, we determine whether the responsibilities or knowledge of each employee would compromise the employer's right to confidentiality concerning the collective negotiations process if the employee was included in a negotiating unit.

After engaging in an individualized analysis of the employees claimed by the Authority to be confidential, PERC excluded one employee who had been promoted since the hearing officer's report to a position involving the analysis and formulation of collective negotiations strategies relating to possible changes in employee medical insurance benefits. 19 *N.J.P.E.R.* ¶ 24218.

The balance of PERC's opinion addressed intra-unit conflicts of interest among supervisors. Such conflicts were addressed by this Court in *Board of Education v. Wilton*, which held that where "substantial actual or potential conflict of interest exists among supervisors with respect to their duties and obligations to the employer in relation to each other, the requisite community of interest among them is lacking," thereby making a single unit impermissible. 57 *N.J.* 404, 427, 273 *A.*2d 44 (1971). Relying on *Wilton*, PERC concluded that "it would be inappropriate for the proposed unit to include supervisors who supervise and evaluate other supervisors" and excluded twenty employees. 19 *N.J.P.E.R.* ¶ 24218.

PERC's decision concluded by listing both those employees excluded from joining the proposed unit and those eligible for unit membership. PERC ordered an election among the eligible employees to determine if a majority of those employees wished to be represented by AFSCME for the purpose of collective negotiations. *Ibid.*

AFSCME won that election. On October 21, 1993, PERC certified AFSCME Local 3914 as the majority representative for a supervisory unit. On September 15, 1993, AFSCME Local 3913 had filed a petition seeking to represent a negotiating unit consisting primarily of the non-supervisor professionals excluded from the Local 3914 unit. That same day, AFSCME Local 3912 had

filed a petition seeking to represent a negotiating unit composed predominantly of the supervisors excluded from the Local 3914 unit because of supervisory conflicts. On June 28, 1994, PERC's Director of Representation directed elections for those two negotiating units. D.R. No. 94–29, 20 *N.J.P.E.R.* ¶ 25149 (1994). Local 3912 and Local 3913 won the respective elections. On August 25, 1994, AFSCME Local 3913 was certified as the majority representative for a unit of professional employees. On August 29, 1994, AFSCME Local 3912 was certified as the majority representative for a second supervisory unit.

The Authority appealed those certifications to the Appellate Division, which consolidated the three appeals. 289 *N.J.Super.* at 25, 672 *A.*2d 1244. The State of New Jersey was granted leave to participate as *amicus curiae.*

While acknowledging that courts ordinarily defer to an agency's interpretation of a statute enforced by that agency, the Appellate Division noted that no deference is required when the agency interpretation " 'flout[s] the statutory language and undermine[s] the intent of the Legislature.' " *Id.* at 26, 672 *A.*2d 1244 (quoting *GE Solid State, Inc. v. Director, Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993)). The court asserted that PERC misconstrued and misapplied the "managerial executive" and "confidential employee" definitions promulgated by the Legislature. *Ibid.*

The court's analysis began by recognizing that Article I, Paragraph 19 of the New Jersey Constitution grants public employees the right to organize and present their grievances through representatives of their own choosing, a right codified in the Act. *Id.* at 27, 672 *A.*2d 1244. The court noted, however, that the right of public sector employees to collectively negotiate is narrower than that afforded private sector employees. *Ibid.* The court further noted that an overriding concern of labor law " '[has been] to assure the employer of a loyal and efficient cadre of supervisors and managers independent from the rank and file,' " *id.* at 27–28,

672 *A.*2d 1244 (quoting *State Management Ass'n of Connecticut, Inc. v. O'Neill,* 204 *Conn.* 746, 529 *A.*2d 1276, 1280 (1987)).

Turning to the managerial executive exception, the court traced the history of the Act. *Id.* at 29–31, 672 *A.*2d 1244. The 1968 Act, commonly known as Chapter 303, prohibited "any managerial executive" from joining a collective negotiating unit. *Id.* at 29, 672 *A.*2d 1244. The term "managerial executive" was undefined by Chapter 303. *Ibid.* Chapter 303 did, however, provide "supervisors" with the right to collectively negotiate. *Ibid.* The statute referred to supervisors as those "having the power to hire, discharge, discipline, or to effectively recommend the same." *Ibid.* The Appellate Division concluded that "[s]uch supervisors, we think, refer to those persons commonly understood as on-line supervisors." *Ibid.*

The court noted that, in 1972, the Legislature enacted Assembly Bill 520 in an attempt to amend Chapter 303 to include provisions for unfair labor practice. *Ibid.* Governor Cahill vetoed the bill. *Ibid.* In his veto statement, the Governor recommended that the term "supervisors" be broadly defined, and that supervisors be denied collective negotiation rights. *Id.* at 29–30, 672 *A.*2d 1244. In 1974, the Legislature succeeded in amending Chapter 303. *Id.* at 31, 672 *A.*2d 1244. It did not, however, accept the Governor's recommendation that supervisors be excluded. *Ibid.* Nor did the Legislature more broadly define the term "supervisor," leading the panel to conclude that "supervisor" still means "on-line supervisor." *Ibid.*

The court considered extrajurisdictional caselaw defining "managerial employees," the term used in both private sector labor law and in other states' public sector labor laws. *Id.* at 31–32 & n. 3, 672 *A.*2d 1244. Those cases indicated that courts in Illinois, Pennsylvania, and Massachusetts do not restrict "managerial employees" to those in the highest management echelon. *Id.* at 31–32, 672 *A.*2d 1244. The court contrasted those judicial interpretations with those of PERC, which had developed a body of administrative caselaw indicating that managerial executives are those

"who have the final responsibility to formulate, determine, and effectuate policy that is essential." *Id.* at 32–33, 672 *A.*2d 1244. The court also contrasted PERC's interpretation with the actual language of *N.J.S.A.* 23:13A–3(f) and decided that the statutory definition did not limit "managerial executive" to high level managers. *Id.* at 33–34, 672 *A.*2d 1244.

The court observed that the definition proposed by Governor Cahill in his 1973 veto message was broader than that employed by PERC. *Id.* at 33, 672 *A.*2d 1244. The Governor's definition encompassed those "who formulate management policies and practices, and those who are charged with the responsibility of effectuating and making operative such management policies and practices." *Ibid.* (quoting *Governor's Veto Statement to Assembly Bill No. 520,* at 6 (Feb. 22, 1973) (*Governor's Veto Statement*)). The court noted that final responsibility was not crucial. *Ibid.* Furthermore, the Governor's definition, unlike PERC's interpretation, was disjunctive: managerial executives were those who *either* formulate policies and practices *or* were responsible for effectuating and making operative policies and practices. *Ibid.* An employee need not do both to be considered a managerial executive. *Ibid.*

Although recognizing that the 1974 amendments to Chapter 303 did not adopt verbatim Governor Cahill's proposed definition, the court determined that the Legislature, for all practical purposes, accepted the Governor's proposal. *Id.* at 34, 672 *A.*2d 1244. Referring to those responsible for management policies and procedures, the Governor's proposal used the phrase "effectuating and making operative" instead of the Legislature's phrase "directing the effectuation of," but the court saw "no discernable difference" between the two. *Ibid.* The court found that "[d]irecting the effectuation of a policy or practice is, to us, the same as making the policy or practice operative." *Ibid.* Because Governor Cahill did not intend to narrow the definition of managerial executive, and because the Legislature had functionally adopted the Governor's proposed definition, the Appellate Division inferred that the

Legislature adopted a stance similar to Governor Cahill's concerning managerial executives. *Ibid.*

The court did not disagree with PERC's contention in *Borough of Montvale, supra,* that

> a person formulates policies when he develops a particular set of objectives designed to further the mission of the government unit and when he selects a course of action from among available alternatives. A person directs the effectuation of policy when he is charged with developing the methods, means, and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors.
>
> [*Ibid.*]

The court, based on the statutory language, "add[ed] a reference to practices as well as policies." *Ibid.*

The court also agreed generally with the criteria considered by PERC in determining whether an employee is a managerial executive. *Ibid.* The court disagreed, however, with PERC's assertion that a managerial executive "must possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes." *Id.* at 34–35, 672 *A.*2d 1244 (quoting *Borough of Montvale, supra* ). Additionally, the court held that managerial executives need not *both* formulate policies and practices *and* be responsible for directing the effectuation thereof. *Id.* at 36, 672 *A.*2d 1244. The court further observed that "formulate" was not the equivalent of "adopt" and that, therefore, one could be considered a managerial executive based on responsibility for recommending policies and practices, especially if those recommendations are substantially accepted. *Id.* at 36, 672 *A.*2d 1244. The court concluded that PERC's interpretation of "managerial executive" was both inconsistent with, and narrower than, the statutory definition. *Ibid.* For illustrative purposes, the court critically analyzed PERC's determination that four specifically identified employees were not managerial executives. *Id.* at 36–39, 672 *A.*2d 1244.

The Appellate Division then turned to PERC's interpretation of "confidential employee." *Id.* at 40, 672 *A.*2d 1244. The court

generally agreed with PERC's approach as outlined in *State of New Jersey, supra:*

> We scrutinize the facts of each case to find for whom each employee works, what he does, and what he knows about collective negotiations issues. Finally, we determine whether the responsibilities or knowledge of each employee would compromise the employer's right to confidentiality concerning the collective negotiations process if the employee was included in a negotiating unit.
>
> [*Ibid.*]

However, the court called into question PERC's determination that "confidential employee" is to be narrowly interpreted, and that mere "access to confidential personnel files or information concerning the administrative operations of a public employer" is insufficient to render a person a confidential employee. *Ibid.* Of particular concern to the court was PERC's conclusion that those who assimilate, evaluate, analyze and provide information to superiors for use in the labor negotiations process are not necessarily confidential employees. *Id.* at 41, 672 *A.*2d 1244. The court found that such employees could not be excluded from the definition of "confidential employee" merely because they had no knowledge of the ultimate position taken by the Authority in negotiations. *Id.* at 41–42, 672 *A.*2d 1244. The court noted that "[a] member of the management team need not know the exact positions to be taken in order to make his or her union membership incompatible with his or her managerial duties." *Id.* at 42, 672 *A.*2d 1244.

Finally, the court reiterated that the statutory language mentions knowledge or responsibility "in connection with the issues involved in the collective negotiations process." *Ibid.* The court construed the terms "issues" and "process" to incorporate more than the actual positions taken by the Authority in negotiations. *Ibid.* Neither the language of the definition nor the legislative history suggested to the court that PERC's narrow interpretation was correct. *Ibid.*

The court remanded the matter to PERC for further consideration consistent with its opinion. *Id.* at 43, 672 *A.*2d 1244. PERC and AFSCME petitioned for certification; this Court granted both petitions. 147 *N.J.* 261, 686 *A.*2d 763 (1996). The New Jersey

State AFL–CIO, the International Association of Fire Fighters AFL–CIO, the New Jersey Deputy Fire Chiefs, and the New Jersey League of Municipalities were granted leave to participate as *amicus curiae.*

## II

### A

Article I, Paragraph 19 of the New Jersey Constitution reads in its entirety:

Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing.

Early judicial interpretations of the paragraph merely required that public employers meet and discuss labor disputes with employees; there was no clear obligation to permit or engage in collective negotiations. *See New Jersey Turnpike Auth. v. AFSCME,* 83 *N.J.Super.* 389, 395–99, 200 *A.*2d 134 (Ch.Div.1964) (holding that employees could not strike, but management had to meet with all employee representatives to discuss grievances and proposals in good faith). Early decisions also declared strikes by public employees unlawful. *Donevero v. Jersey City Incinerator Auth.,* 75 *N.J.Super.* 217, 222, 182 *A.*2d 596 (Law Div.1962), *rev'd sub nom. on other grounds, McAleer v. Jersey City Incinerator Auth.,* 79 *N.J.Super.* 142, 146, 190 *A.*2d 891 (App.Div.1963). Public employees were also forbidden from engaging in sickouts, mass resignations, and similar actions. *See Board of Educ. v. New Jersey Educ. Ass'n,* 96 *N.J.Super.* 371, 380–82, 233 *A.*2d 84 (Ch.Div.1967), *aff'd,* 53 *N.J.* 29, 37–40, 247 *A.*2d 867 (1968). Over time, public employees lobbied the Legislature for enhanced collective negotiation rights. *See* Charles J. Coleman & Nancy Gulick, *The New Jersey Courts and the Decline of the Collective Negotiation System,* 14 *Rutgers L.J.* 809, 810 (1983). In 1966, the Legislature established the Public and School Employees' Grievance Procedure Study Commission "to study the need for a

procedure to be established for the presentation of grievances by public and school employees [and] to provide for reports and recommendations by said commission to the Governor and the Legislature...." *L.* 1966, *c.* 170.

That commission's report was submitted in January 1968. *See Final Report of the Public and School Employees' Grievance Procedure Study Commission* (1968). In September 1968, the Legislature, relying in large part on that report, enacted the New Jersey Employer–Employee Relations Act, known as "Chapter 303." *See L.* 1968, *c.* 303. Chapter 303 applied to public employees "except elected officials, heads and deputy heads of departments and agencies, and members of boards and commissions...." *L.* 1968, *c.* 303, § 4 (codified as amended at *N.J.S.A.* 34:13A-3(d)). Chapter 303 also excluded "managerial executives," a term undefined by the Chapter except in relation to school districts, where "managerial executive" meant "the superintendent of schools or his equivalent." *L.* 1968, *c.* 303, § 7 (codified as amended at *N.J.S.A.* 34:13A-5.3). The statute did not refer to "confidential employees."

Chapter 303 provided public employees with the right, "freely and without fear of penalty or reprisal, to form, join and assist any employee organization or to refrain from any such activity." *L.* 1968, *c.* 303, § 7 (codified as amended at *N.J.S.A.* 34A:13A-5.3). "Negotiating units" formed pursuant to Chapter 303 were to be defined "with due regard for the community of interest among the employees concerned...." *Ibid.* Supervisors "having the power to hire, discharge, discipline, or to effectively recommend the same" could generally organize so long as supervisory units did not admit nonsupervisory personnel. *Ibid.*

Chapter 303 also created PERC. *See L.* 1968, *c.* 303, § 6(a) (codified as amended at *N.J.S.A.* 34:13A-5.2(a)). The Legislature charged PERC with making policy and establishing "rules and regulations concerning employer-employee relations in public employment relating to dispute settlement, grievance procedures and administration including enforcement of statutory provisions con-

cerning representative elections and related matters." *Ibid.* PERC was also authorized to intervene "in matters of recognition and unit definition" in the event of a dispute. *L.* 1968, *c.* 303, § 7 (codified as amended at *N.J.S.A.* 34:13A–5.3).

PERC encountered some difficulty in interpreting Chapter 303. In *City of Elizabeth*, P.E.R.C. No. 36, *N.J.P.E.R.* Supp. 36 (1970), PERC noted that Chapter 303 did not define "managerial executive." In the absence of a statutory definition, PERC relied on the "general meaning of the term." PERC found that "[t]he essential characteristics of the term denote one who determines and executes policy through subordinates in order to achieve the goals of the administrative unit for which he is responsible or for which he shares responsibility." Relying on that definition, PERC determined that the police chief and deputy chiefs of the Elizabeth Police Department were not managerial executives. The department director, not the chief and deputies, was responsible for hiring and firing. Additionally, although the chief and deputy chiefs assisted in the budgetary and policymaking process of the department, final responsibility rested with the department director. PERC found that "[i]t is this final responsibility to formulate, determine and effectuate policy and not the initial preparation of a budget or of policy proposals that distinguishes the managerial executive from other staff or line positions."

Later that year, in *County of Union*, P.E.R.C. No. 48, *N.J.P.E.R.* Supp. 48 (1970), PERC again attempted to ascertain the definition of "managerial executive" that had been omitted from Chapter 303. After noting that "the indicia of such status have not been exhaustively treated in the available precedents of the Commission," PERC distilled four characteristics consistently associated by the National Labor Relations Board with employees who are "executive":

(1) a person identified with management interest;

(2) one who formulates and effectuates management policies by expressing and making operative the decisions of the employer;

(3) one who exercises discretion in the performance of his job; and

(4) one who has the ability to make purchases and pledge the credit of the Employer.

PERC also relied on Regulation 4 of the New Jersey Department of Labor and Industry, which defined an executive as

[a]ny employee (a) whose primary duty consists of the management of the enterprise in which he is employee or of a customarily recognized department or subdivision thereof; and (b) who customarily and regularly directs the work of two or more other employees therein; and (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to hiring and firing and as to advancement and promotion or any other change of status of any other employee will be given particular weight and (d) who customarily and regularly exercises discretionary powers.

After considering those definitions, PERC determined that a deputy county treasurer was a managerial executive. The deputy treasurer had hired employees, invested large sums, participated in the preparation and consideration of the department budget, and recommended promotions and job title changes. PERC determined that "it would be safe to conclude" that the deputy treasurer was properly excludible from a collective negotiating unit.

In 1972, the Legislature attempted to amend Chapter 303 by enacting Assembly Bill No. 520, in part to define PERC's authority to decide unfair labor practice questions. Governor Cahill conditionally vetoed the bill. The Governor's veto message included several proposed definitions intended to broaden the exclusions to the Act to make those exclusions more consistent with private sector labor law. The Legislature finally amended Chapter 303 in 1974 by passing Senate Bill No. 1087. *See L.* 1974, *c.* 123. Those amendments, popularly known as Chapter 123, either rejected or modified Governor Cahill's proposed definitions.

The Governor had proposed that supervisors, whom he recommended not be permitted to organize, be defined as follows:

The term "supervisor" means any individual having authority, in the interest of the public employer, to hire, transfer, suspend, lay off, recall, evaluate, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

[*Governor's Veto Statement, supra,* at 6.]

The Legislature rejected that proposal, retained the following clause from Chapter 303, and continued to permit supervisors to organize so long as supervisory and non-supervisory employees were not in the same unit:

> [A] supervisor [has] the power to hire, discharge, discipline, or to effectively recommend the same . . . .
>
> [*L.* 1974, *c.* 123, § 4 (codified at *N.J.S.A.* 34:13A-5.3).]

Concerning managerial executives, Governor Cahill had proposed that:

> The term "managerial executive" refers to persons who formulate management policies and practices, and to those who are charged with the responsibility of effectuating and making operative such management policies and practices.
>
> [*Governor's Veto Statement, supra,* at 6.]

The Legislature enacted the following definition:

> "Managerial executives" of a public employer means persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that in any school district this term shall include only the superintendent or other chief administrator, and the assistant superintendent of the district.
>
> [*L.* 1974, *c.* 123, § 2 (codified at *N.J.S.A.* 34:13A-3(f)).]

Regarding confidential employees, Governor Cahill had proposed that:

> The term "confidential employee" means one whose access to confidential personnel files or information concerning the administrative operations of a public employer and functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make membership in any appropriate negotiating unit incompatible with his official duties.
>
> [*Governor's Veto Statement, supra,* at 6.]

The Legislature enacted the following definition:

> "Confidential employees" of a public employer means employees whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiating unit incompatible with their official duties.
>
> [*L.* 1974, *c.* 123, § 2 (codified at *N.J.S.A.* 34:13A-3(g)).]

Finally, Chapter 303 had provided that the term "employee" included "[any] public employee . . . except elected officials, *heads and deputy heads of departments and agencies,* and members of

boards and commissions...." *L.* 1968, *c.* 303, § 4 (emphasis added). In enacting Chapter 123, the Legislature interpreted "employee" to exclude "elected officials, members of boards and commissions, *managerial executives and confidential employees.*" *L.* 1984, *c.* 123, § 2 (codified at *N.J.S.A.* 34:13A–3(d)).

*Borough of Montvale, supra,* remains PERC's seminal case concerning the managerial executive exception. *See, e.g., Borough of Bloomingdale,* D.R. No. 95–13, 21 *N.J.P.E.R.* ¶ 26018 (1994); *Township of Willingboro,* D.R. No. 92–16, 18 *N.J.P.E.R.* ¶ 23057 (1992); *State of New Jersey,* D.R. No. 90–8, 15 *N.J.P.E.R.* ¶ 20269 (1989). PERC continues to require that "managerial executive[s] must possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes," *Borough of Montvale, supra,* and continues to construe the managerial executive exception narrowly. *See, e.g., Township of Easthampton,* D.R. No. 94–1, 19 *N.J.P.E.R.* ¶ 24178 (1993) (reiterating that "[t]he Commission narrowly construes the term 'managerial executive' ").

With the exception of the opinion below, no published judicial decision has interpreted the managerial executive exception to the Act. *Cf. Department of Community Affairs v. Cook,* 282 *N.J.Super.* 207, 211, 659 *A.*2d 936 (App.Div.1995) (determining that member of board of trustees of municipal public library was managerial executive required to make personal financial disclosures under Local Government Ethics Law).

Concerning the confidential employee exception, PERC continues to rely on the framework set forth in *State of New Jersey, supra,* 11 *N.J.P.E.R.* ¶ 16179, to determine if an employee is confidential. *See, e.g., Woodbridge Township Hous. Auth.,* D.R. No. 96–5, 21 *N.J.P.E.R.* ¶ 26212 (1995); *Greenwich Township Bd. of Educ.,* P.E.R.C. No. 93–27, 18 *N.J.P.E.R.* ¶ 23224 (1992); *Lakewood Hous. Auth.,* D.R. No. 89–25, 15 *N.J.P.E.R.* ¶ 20087 (1989). Like the term "managerial executive," the term "confidential employee" continues to be narrowly construed by PERC.

*See, e.g., Summit Bd. of Educ.*, D.R. No. 95–27, 21 *N.J.P.E.R.* ¶ 26106 (1995) ("Confidential employees are excluded from the Act's definition of 'employee' and do not enjoy the Act's protections. Consequently, the Commission has narrowly construed the term confidential employee." (citation omitted)). Consonant with that narrow construction, PERC's decisions have suggested that mere access to confidential labor relations information is insufficient to render an employee confidential. *Monmouth Reg'l Bd. of Educ.*, D.R. No. 94–10, 20 *N.J.P.E.R.* ¶ 25009 (1993) ("Although access to confidential information is a relevant factor in the determination of confidential status within the meaning of the Act, by itself it is not enough to make an employee confidential."); *see also Little Ferry Bd. of Educ.*, D.R. No. 80–19, 6 *N.J.P.E.R.* ¶ 11033 (1980) (holding that secretary's mere access to locked files that contained confidential labor relations notes and other materials was not, absent additional factors, sufficient to render secretary confidential employee).

PERC's decisions are somewhat in tension with the sole published judicial opinion addressing the confidential employee exception. In *Township of Wayne v. AFSCME*, 220 *N.J.Super.* 340, 532 *A.2d* 255 (1987), the Appellate Division considered whether a municipal deputy clerk certified to a negotiating unit by PERC was, in fact, an excludible confidential employee. The hearing officer's report on which PERC based its decision stated that the deputy clerk had "access and exposure to the collective negotiations process." *Id.* at 345, 532 *A.2d* 255. The deputy clerk also had access to confidential labor relations material such as tape recordings of closed town council sessions. *Ibid.* Furthermore, the deputy clerk assumed the clerk's "full authority" in the clerk's absence. *Ibid.* However, because the deputy clerk had never been privy to actual council discussions concerning labor relations, the hearing officer concluded that the deputy clerk was "lacking the element of knowledge or exposure required so as to find her to be a confidential employee." *Ibid.* The hearing officer declared that "[a] finding that an employee may have some potential involvement in the labor relations process is not sufficient to

designate such an employee as confidential." *Ibid.* Reversing
PERC's holding validating the conclusions of the hearing officer,
the Appellate Division held that it had "no doubt that the Deputy
Clerk's functional responsibilities and knowledge touching upon
collective negotiations issues" made her a confidential employee.
*Id.* at 345–46, 532 *A.*2d 255. The court could not ignore the
temptations that might cause the deputy clerk to transmit confi-
dential data to her negotiating unit. *Id.* at 346, 532 *A.*2d 255.
The fact that the deputy had never exploited her position was
immaterial. *Ibid.* Rather, because "the access to highly confiden-
tial labor relations information" creates intolerably conflicting
loyalties, the court held that the deputy clerk's membership in a
negotiating unit could not be permitted. *Ibid.*

## B

We have consistently accorded "substantial deference to
the interpretation of the agency charged with enforcing an act."
*Merin v. Maglaki,* 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992). An
agency's interpretation prevails unless "plainly unreasonable."
*Ibid.* (citing *Metromedia, Inc. v. Director, Div. of Taxation,* 97
*N.J.* 313, 327, 478 *A.*2d 742 (1984)); *cf. Greenwood v. State Police
Training Center,* 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992) (reiterat-
ing that agencies "have no superior ability to resolve purely legal
questions," and that courts are not bound by agency's resolution of
legal issue). Our caselaw establishes, however, that if an agency's
statutory interpretation is contrary to the statutory language, or if
the agency's interpretation undermines the Legislature's intent,
no deference is required. *See GE Solid State, Inc. v. Director,
Div. of Taxation,* 132 *N.J.* 298, 306–07, 625 *A.*2d 468 (1993); *In re
Adoption of N.J.A.C. 7:26B,* 128 *N.J.* 442, 450, 608 *A.*2d 288 (1992).
Clear legislative intent cannot be trumped by countervailing ad-
ministrative practices. *Airwork Serv. Div. v. Director, Div. of
Taxation,* 97 *N.J.* 290, 296, 478 *A.*2d 729 (1984), *cert. denied,* 471
*U.S.* 1127, 105 *S.Ct.* 2662, 86 *L.Ed.*2d 278 (1985). Furthermore, an
administrative agency may not interpret a statute to give it

greater effect than its statutory language permits. *See Kingsley v. Hawthorne Fabrics, Inc.,* 41 *N.J.* 521, 528, 197 *A.*2d 673 (1964); *see also Service Armament Co. v. Hyland,* 70 *N.J.* 550, 563, 362 *A.*2d 13 (1976) ("[A]n administrative interpretation which attempts to add to a statute something which is not there can furnish no sustenance to the enactment.").

### III

█ PERC's interpretation of the Act is entitled to substantial deference. *See Merin, supra,* 126 *N.J.* at 436–37, 599 *A.*2d 1256. Thus, this Court will yield to PERC unless its interpretations are plainly unreasonable, *ibid.,* contrary to the language of the Act, or subversive of the Legislature's intent, *see GE Solid State, Inc., supra,* 132 *N.J.* at 306–07, 625 *A.*2d 468. However, to the extent that PERC has exceeded the bounds of the Act and has engrafted standards not found in the statutory language, a correction is warranted. *See Airwork Serv. Div., supra,* 97 *N.J.* at 296, 478 *A.*2d 729; *Service Armament Co., supra,* 70 *N.J.* at 563, 362 *A.*2d 13; *Kingsley, supra,* 41 *N.J.* at 528, 197 *A.*2d 673.

Although we recognize, as did the Appellate Division, that a public employer is entitled to a loyal management team, the concerns facing a public employer differ somewhat from those facing a private employer. A private employer's interest focuses primarily on the maximization of profit; the employees' interests emphasize the enhancement of their compensation and benefits. To the extent that private employers can reduce wages, the profits available to business owners increase. A private sector employer must have the undivided loyalty of a relatively large group of employees, including supervisors. The size of that management group becomes particularly important if private non-supervisory workers exercise their legal right to strike; an employer should have a workforce sufficient to sustain at least a minimal level of operation. For those reasons, federal private sector labor law specifically excludes supervisors from its definition of "employee"

and does not permit supervisors to unionize. *See* 29 *U.S.C.A.* § 152(3), (11).

A somewhat different labor relations dynamic prevails in the public sector. Although public sector labor negotiations over compensation and other terms and conditions of employment frequently are protracted and adversarial, the elimination of the right to strike exerts a restraining influence on the negotiation process. Moreover, in comparison to the private sector, our impression is that public employers and public employees generally share a stronger common interest in the mission of the organization. In affording supervisors organizational rights under the Act, we infer that the Legislature appropriately took into account the differences between private and public sector labor negotiations.

The Legislature also recognized several other distinctions between private and public sector labor law. As noted, public employees may not strike, *see Donevero, supra,* 75 *N.J.Super.* at 222, 182 *A.2d* 596. Furthermore, the scope of negotiations in the public sector is narrower than that in the private sector. *See N.J.S.A.* 34:13A–5.3 (referring to public employees' negotiating rights concerning "rules governing working conditions ... grievances, disciplinary disputes, and other terms and conditions of employment."). In *Township of West Windsor v. PERC,* this Court held that

> employee proposals seeking to influence the actions of a public employer when it acts in a governmental capacity—rather than as an employer—are most appropriately presented through the political process and not through the labor relations process.
>
> [T]he preferred access for public employees resulting from the statutory requirement of mandatory good faith negotiation and compulsory grievance presentation, with its consequent enhancement of the effectiveness of their voice in governmental decision-making, is inappropriate with respect to matters which do not affect the terms and conditions of public employment. Only when government acts in the capacity of an employer, as opposed to discharging governmental policy-making functions, is such preferred access necessary to protect the legitimate interests of public employees in the determination of the terms and conditions of their employment.

[78 *N.J.* 98, 114, 393 *A.2d* 255 (1978).]

Similarly, in *Ridgefield Park Education Association v. Ridgefield Park Board of Education,* we held that "there are but two categories of subjects in public employment negotiation—mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy." 78 *N.J.* 144, 162, 393 *A.*2d 278 (1978). Therefore, public employees are afforded negotiations rights concerning only a limited range of subjects that intimately and directly affect their work and welfare, a factor that may tend further to differentiate private sector labor negotiations from those in the public sector.

■ The Appellate Division notes that, under Chapter 303, supervisors, defined as those "having the power to hire, discharge, discipline, or effectively recommend the same," were permitted to organize. 289 *N.J.Super.* at 29, 672 *A.*2d 1244. The court concluded that "[s]uch supervisors, we think, refer to those persons commonly understood as on-line supervisors." *Ibid.* The court acknowledged that the Legislature had rejected Governor Cahill's broad definition of "supervisors" together with his recommendation that supervisors be excluded from membership in negotiating units. *Id.* at 29–31, 672 *A.*2d 1244. The court found it significant, however, that the Legislature, when it enacted Chapter 123, did not alter its definition of supervisors beyond that found in Chapter 303. *Id.* at 31, 672 *A.*2d 1244. Based on that analysis, the Appellate Division apparently found that only "on-line supervisors," a term that presumably includes only first-level supervisors, may join a negotiating unit. *Ibid.* We find that conclusion to be inconsistent with the statutory scheme. Higher-level supervisors who are not elected officials or members or boards or commissions and who do not fall within the "managerial executive" or "confidential employee" exclusions may organize; in the event that "an actual or potential substantial conflict of interest" exists between different levels of supervisors, separate supervisory units should be formed. *See Wilton, supra,* 57 *N.J.* at 425, 273 *A.*2d 44.

The statutory definition of "managerial executives" reads:

"Managerial executives" of a public employer means persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that in any school district the term shall include only the superintendent or other chief administrator, and the assistant superintendent of the district.

[*N.J.S.A.* 34:13A–3(f).]

That definition differs from that proposed by Governor Cahill in two respects. First, the Legislature defined "managerial executives" in terms of school employees as being "the superintendent or other chief administrator, and the assistant superintendent of the district." *Ibid.* Second, although the Governor had recommended exempting persons *effectuating and making operative such management policies and practices, Governor's Veto Statement, supra,* at 6, the Legislature's definition excludes persons *directing the effectuation of such management policies and practices, N.J.S.A.* 34:13A–3(f). We disagree with the Appellate Division's observation that "[d]irecting the effectuation of a policy or practice is, to us, the same as making the policy or practice operative." 289 *N.J.Super.* at 34, 672 *A.2d* 1244. The statutory definition is clearly narrower than that proposed by Governor Cahill in his veto message; "directing the effectuation" connotes a higher level of authority than does "effectuating and making operative."

PERC narrowed the scope of the managerial executive exception beyond the statutory definition by requiring that managerial executives "possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes." *Borough of Montvale, supra.* At oral argument before this Court, the Senior Deputy Attorney General appearing for the State noted that the State had desired to challenge and seek clarification of the *Borough of Montvale* standard since its pronouncement in 1980. However, because no appropriate case had presented itself, the issue had evaded review. Therefore, although the passage of more than a decade between the *Borough of Montvale* decision and the State's participation in this proceeding would suggest a tacit acceptance of *Borough of Montvale* by the State, that is

evidently not the case. Moreover, we note the acknowledgement by PERC's counsel at oral argument that managerial executives need not necessarily possess and exercise authority beyond the departmental level to qualify for the statutory exception.

We view the requirement that managerial executives "possess and exercise a level of authority and independent judgment sufficient to affect broadly the organization's purposes or its means of effectuation of these purposes" as unduly restrictive, particularly as applied to large organizations such as the Authority in which managers may have significant power, discretion and influence within their own departments and yet not "affect broadly the organization's purposes or its means of effectuation of these purposes." The requirement that a managerial employee be one who broadly affects the agency's mission should not be a condition of exclusion, but merely an example of a manager who should be excluded.

Excised of the requirement that an employee must exercise organization-wide power in order to fit within the managerial executive exception, the pertinent test adopted by *Borough of Montvale* reads:

> A person formulates policies when he develops a particular set of objectives designed to further the mission of [a segment of] the governmental unit and when he selects a course of action from among available alternatives. A person directs the effectuation of policy when he is charged with developing the methods, means, and extent of reaching a policy objective and thus oversees or coordinates policy implementation by line supervisors. Whether or not an employee possesses this level of authority may generally be determined by focusing on the interplay of three factors: (1) the relative position of that employee in his employer's hierarchy; (2) his functions and responsibilities; and (3) the extent of discretion he exercises.

The statutory definition, together with the *Borough of Montvale* standard as modified today, provides a functional test that is neither plainly unreasonable, *Merin, supra,* 126 *N.J.* at 436–37, 599 *A.*2d 1256, contrary to the language of the Act, nor subversive of the Legislature's intent, *see GE Solid State, Inc., supra,* 132 *N.J.* at 306–07, 625 *A.*2d 468.

The statutory definition of "confidential employees" reads as follows:

"Confidential employees" of a public employer means employees whose functional responsibilities or knowledge in connection with the issues involved in the collective negotiations process would make their membership in any appropriate negotiating unit incompatible with their official duties.

[*N.J.S.A.* 34:13A–3(g).]

Like the Appellate Division, we find PERC's approach to determining whether an employee is confidential as articulated in *State of New Jersey, supra,* 11 *N.J.P.E.R.* ¶ 16179, to be generally consistent with the statutory definition.

Although the Appellate Division's holding in *Township of Wayne, supra,* suggests that access to confidential labor relations information creates sufficiently conflicting loyalties to make an employee confidential, 220 *N.J.Super.* at 346, 532 *A.*2d 255, PERC has held that mere access to such information does not automatically confer confidential employee status, *see, e.g., Little Ferry Bd. of Educ., supra.* The opinion below quotes with approval from *Township of Wayne,* 289 *N.J.Super.* at 42, 672 *A.*2d 1244, and concludes that those who have more than "mere access" to confidential information—those who "assimilate it, evaluate it, analyze it and provide significant information to their supervisors"—must be excluded as confidential employees, *id.* at 40–42, 672 *A.*2d 1244.

We note a significant disparity between the definition of "confidential employee" proposed by Governor Cahill in his conditional veto of Assembly Bill No. 520 and the definition enacted by the Legislature in Chapter 123. Governor Cahill proposed that the term include a reference to those with "access to confidential personnel files or information concerning the administrative operations of a public employer...." *Governor's Veto Statement, supra,* at 6. The Legislature declined to adopt that specific exclusion. That omission suggests that the Legislature did not mean to preclude those with mere access to confidential general personnel information from joining a collective negotiating unit. The functional test set forth in the statutory definition of "confidential employee" together with the standards set forth by PERC in *State of New Jersey, supra,* 11 *N.J.P.E.R.* ¶ 16179, can adequately

address whether those employees with access to labor relations materials should be excluded from unit membership. The baseline inquiry remains whether an employee's functional responsibilities or knowledge "would make their membership in any appropriate negotiating unit incompatible with their official duties." *N.J.S.A.* 34:13A-3(g); *see also State of New Jersey, supra,* 11 *N.J.P.E.R.* ¶ 16179 (holding that final determination is "whether the responsibilities or knowledge of each employee would compromise the employer's right to confidentiality concerning the collective negotiations process if the employee was included in a negotiating unit."). Obviously, an employee's access to confidential information may be significant in determining whether that employee's functional responsibilities or knowledge make membership in a negotiating unit inappropriate. However, mere physical access to information without any accompanying insight about its significance or functional responsibility for its development or implementation may be insufficient in specific cases to warrant exclusion. The test should be employee-specific, and its focus on ascertaining whether, in the totality of the circumstances, an employee's access to information, knowledge concerning its significance, or functional responsibilities in relation to the collective negotiations process make incompatible that employee's inclusion in a negotiating unit. We entrust to PERC in the first instance the responsibility for making such determinations on a case-by-case basis.

The opinion below criticized PERC for not excluding as confidential those employees who "assimilate," "evaluate," "analyze" and otherwise "provide significant information to their supervisors" for use in the labor negotiations process. 289 *N.J.Super.* at 41, 672 *A.*2d 1244. Although an employee who engages in some or all of those activities will be highly likely to have "functional responsibilities or knowledge" sufficient to make them a "confidential employee," we decline to pronounce generally that such employees should be excluded *per se.* Rather, application of the statute and PERC's review on a case-by-case basis is a more appropriate method of determining those employees that should be excluded from a negotiating unit.

## IV

As modified by this opinion, we affirm the judgment of the Appellate Division remanding the matter to PERC for further proceedings.

*For modification and affirmation*—Chief Justice PORITZ and Justices HANDLER, O'HERN, STEIN, GARIBALDI and COLEMAN—6.

*Opposed*—None.